UNITED STATES v. INNES.

(District Court, D. Oregon. December 14, 1914.)

No. 6518.

1. ALIENS (§ 23*) — CHINESE PERSONS — EXCLUSION — LANDING OF VESSEL'S CREW.

Chinese Exclusion Act (Act Sept. 13, 1888, c. 1015, § 9, 25 Stat. 478 [Comp. St. 1913, § 4310]) provides that the master of any vessel, who shall knowingly bring within the United States and land or permit to be landed any Chinese laborer or other Chinese person in contravention of the provisions of the act, shall be guilty of a misdemeanor. *Held*, that such act did not prohibit the bringing of Chinese within the United States as a vessel's crew without intent that they shall remain in the United States but shall depart with the vessel, nor did it prohibit the members of a Chinese crew from being allowed shore leave, subject to the regulations of the Commissioner of Immigration, while the vessel remained in port.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 76–90; Dec. Dig. § 23.*]

2. ALIENS (§ 36*) — CHINESE PERSONS — IMPORTATION — "PERMIT" — "KNOWINGLY."

Chinese Exclusion Act, § 9, provides that the master of any vessel, who shall knowingly bring within the United States on such vessel and land or permit to be landed any Chinese laborer, etc., shall be guilty of a misdemeanor. *Held*, that the word "permit," as so used, meant to suffer or allow to be or come to pass, to take place by tacit consent or by not prohibiting or hindering, allowing without expressly authorizing, and the word "knowingly," with knowledge, actual or imputable; and hence the offense was not committed by the master of a ship, who had taken reasonable precautions to prevent members of his Chinese crew from going ashore, by the escape of a Chinese carpenter without knowledge of the master either that the Chinaman was going ashore or that he intended not to return to the ship if permitted to land.

[Ed. Note.—For other cases, see Aliens, Dec. Dig. § 36.*

For other definitions, see Words and Phrases, First and Second Series, Knowingly; Permission.]

R. M. Innes was informed against for alleged knowingly and unlawfully permitting an alien Chinese person to land in the United States, in violation of the Chinese Exclusion Law. Information dismissed, and defendant discharged.

E. A. Johnson, Asst. U. S. Atty., of Portland, Or.

Huffer & Hayden, of Tacoma, Wash., for defendant.

WOLVERTON, District Judge. The defendant is, upon information of the prosecuting attorney, charged with knowingly and unlawfully permitting one Ah Quai, the said Ah Quai being an alien and a Chinaman, to enter into and land, and be landed in the United States, in violation of section 9 of the act of September 13, 1888. 25 Stat. 476. Trial was had before the court; a jury being waived.

[1] Section 9 of the act, which is the section under which the information is preferred, provides:

"That the master of any vessel who shall knowingly bring within the United States on such vessel, and land, or attempt to land, or permit to be landed

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

218 F.—45

any Chinese laborer or other Chinese person, in contravention of the provisions of this act, shall be deemed guilty of a misdemeanor."

The first section of the act declares that it shall be unlawful for any Chinese person, whether a subject of China or of any other power, to enter the United States, except as in the act provided, and the act is very properly entitled "An act to prohibit the coming of Chinese laborers to the United States."

The offense denounced is against the master of a vessel for bringing within the United States, and landing, or attempting to land, or permitting to land, any Chinese laborer or other Chinese person, in contravention of the provisions of the act. The act has for its purpose the exclusion from the United States of all Chinese persons, with the exceptions designated. The denunciation of the statute, as just indicated, is against bringing such within the United States and permitting them to land. The act, by reasonable intendment, does not inhibit the bringing of Chinese within the United States as a crew upon a vessel, to depart when the vessel departs; there being no intention or purpose that the Chinese shall remain in the United States. Nor do I conceive that the statute will be violated if the members of the Chinese crew are allowed shore leave, subject to the regulations of the Commissioner of Immigration, at a time while the vessel is in port; it being the understanding and purpose, of course, that such members shall return to and depart with the vessel, and not remain within the United States for any purpose. Taylor v. United States, 207 U. S. 120, 28 Sup. Ct. 53, 52 L. Ed. 130; United States v. Ah Fook, 183 Fed. 33, 105 C. C. A. 325.

[2] With this understanding of the act, we may ascertain the meaning of the word "permit," as the charge is that the master did permit the said Ah Quai to land. The primary definition, as given in the Century Dictionary, is:

"To suffer or allow to be, come to pass, or to take place, by tacit consent or by not prohibiting or hindering; allow without expressly authorizing."

It is said in Gregory v. United States, 17 Blatchf. 325, 330, Fed. Cas. No. 5,803:

"The word 'permit' is defined thus: 'To grant permission, liberty, or leave; to allow; to suffer; to tolerate; to empower; to license; to authorize.' The word 'suffer' is defined thus: 'To allow; to admit; to permit.' The word 'admit' is defined thus: 'To permit; to suffer; to tolerate.' The word 'allow' is defined thus: 'To suffer; to tolerate.' The word 'tolerate' is defined thus: 'To allow so as not to hinder; to permit as something not wholly approved; to suffer; to endure; to admit.' Every definition of 'suffer' and 'permit' includes knowledge of what is to be done under the sufferance and permission, and intention that what is done is what is to be done."

The word "knowingly" is employed in the present statute, as it was in the statute which was being considered in the opinion. As illustrative here, the learned judge further says:

"When it is said that a person suffers or permits a yard to be used for purposes of ingress and egress to and from a distillery, his sufferance or permission must be applied to the whole subject-matter, and he does not suffer or permit the ingress and egress to and from the distillery, unless he is conscious that there is a distillery as well as ingress and egress."

Applying the thought here, the defendant must not only have had knowledge, imputable at least, that the Chinaman was going ashore, but he must also have had reasonable grounds to believe that the Chinaman would not return to the ship if allowed to land.

The defendant was obliged to put into the Port of Astoria on account of insufficiency of coal to carry him to Seattle. While in that port, and about 4 o'clock in the afternoon, he was advised by a member of the crew (the crew being composed in the main of Chinamen) that Ah Quai, the carpenter, was intending to go ashore and desert the ship. Being so advised, he at once took steps to procure watchmen to prevent the Chinaman from leaving the ship. He succeeded in obtaining the services of E. T. Gooch, the immigration inspector, and L. M. Persons, also in the immigration service, the former of whom came to the ship about 5:30 p. m. and the latter a half hour later. These two continued their watch on and about the ship from the time of their arrival.

About the time of Gooch's arrival, two Chinamen were seen starting to leave the ship, and the captain, as he says, believing they were local Chinese, permitted them to depart. These men subsequently returned, and proved to be part of the crew. Subsequently three other Chinamen, being members of the crew also, returned to the ship. By what authority they went ashore does not appear. However, no other Chinamen were seen to go ashore after the watch was instituted. Near 7 o'clock, or shortly thereafter, it was reported, without special information as to where the news came from, that the carpenter was missing. When the captain was informed of it, he said he thought he would be back. Gooch and Persons made an effort to find the Chinaman, but were unable to do so, and the ship weighed anchor without him.

Persons testifies that he heard the captain ask the mate to see if the carpenter was in his room, and that he (Persons) went with the mate and found that he was not there. Persons further says he later heard the mate say to the captain, "The carpenter is now in his room;" and that he went at once to the carpenter's room and did not find him there. The captain testifies that it was not his intention to allow any of the Chinamen ashore, and that he kept watch until the watchmen came on board, and instructed his officers to the same purpose. Brodie, the chief officer aboard, testifies that, after the immigration officers came on board, he saw Ah Quai on the forward deck, and spoke to him, and sent him aft into No. 3 hold to do some work. This was about 6:45 p. m. He further states that, after 7 o'clock, search was made for him, but without avail. The third officer relates that he saw the carpenter on the fore well deck about 7 o'clock; that he had been working down No. 3 hold all day; and that he did not see him after that time.

The strong tendency of this testimony is to the effect that Ah Quai was aboard the ship at the time the immigration officers came on as watchmen, and that from that time on the master was doing all that could reasonably be expected of him to prevent his escape to shore. At least I am unable to say, beyond a reasonable doubt, that the mas-

ter permitted the Chinaman to land, within the purview of the act in question.

The information will therefore be dismissed, and the defendant discharged.